IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,776






RAY MCARTHUR FREENEY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM CAUSE NO. 909843 IN THE 337TH DISTRICT COURT

HARRIS COUNTY





 Keasler, J., delivered the opinion of the Court in which Keller, P.J., and Meyers,
Price, Womack, Johnson, Hervey, and Holcomb, JJ., joined. Cochran, J., concurred in
point of error three and otherwise joined the opinion.


O P I N I O N



 Ray McArthur Freeney was convicted in August 2003 of capital murder. (1) Pursuant
to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure
Article 37.071, Sections 2(b) and 2(e), (2) the trial court sentenced Freeney to death. (3) Direct
appeal to this Court is automatic. (4) Freeney raises sixteen points of error challenging his
conviction and sentence. We reject his contentions and affirm the conviction and sentence.

STATEMENT OF FACTS

 Freeney was indicted for the murders of Kirshalynne Jones and Vicky Dean during
different criminal transactions but pursuant to the same scheme or course of conduct. Prior
to her murder, fifteen-year-old Jones had been staying with some relatives in the Travel
Lodge Motel located at the intersection of Beltway 8 and Highway 59 in Houston. Jones
became friends with fellow motel guest Margaret Sims, and soon moved into the motel room
that Sims shared with her boyfriend, Jason Shiner. Sims and Jones worked as prostitutes. 
They generally solicited customers on Bissonnet Road and brought them back to their room
at the Travel Lodge. 

 Shiner testified that he drove Jones and Sims to Bissonnet Road at around midnight
on April 18, 2002. Jones met her first customer, or "date," that evening, and brought him
back to the motel room. When they were finished, Sims arrived with her "date," and Shiner
drove Jones back to Bissonnet Road. Jones had already returned to the motel with another
customer when Shiner came back to pick up Sims. Sims testified that she saw the man with
Jones and that he was about 5'9", had dark skin, and was either bald or had very short hair. 
 Shiner later noticed that Jones had been in the motel room an unusually long time, so
he began calling the room on his cell phone. He tried to call several times, but the line was
busy. He then knocked on the door of the motel room, but no one answered it. He called the
motel office at about 1:30 a.m. and asked for a security guard to assist him. The security
guard attempted to open the door, but it was locked from the inside with a deadbolt. The
security guard went back to the office to retrieve a key. While Shiner waited for him to
return, a bald man with a dark complexion came out of the room. Shiner reached for the
door, but the man pulled it shut. Shiner asked, "Where's the girl?" and the man responded,
"She's in the bathroom. She's okay." Shiner followed the man downstairs and wrote down
his license plate number as he drove away. 

 Shiner and the security guard returned to the motel room. Shiner went inside and
called for Jones but did not get a response. He went into the bathroom, pulled back the
shower curtain, and found Jones's body in the bathtub. He dialed 911 at about 1:45 a.m.

 When Officer Todd Miller arrived at the scene, he saw a blood stain and a fecal matter
stain on the floor at the foot of the bed, and he discovered another large blood stain after he
pulled back the bedspread. There was an empty bottle of Chloraseptic spray on the vanity
near the sink. Jones's body was immersed in water in the bathtub, and there was an empty
bottle of Dial body wash and a pair of underwear floating in the water as well. Joseph
Burrell, the crime scene investigator, testified that he was unable to locate any usable
fingerprints, and that the table in the motel room "had obviously been wiped down."

 The medical examiner testified that Jones died from multiple stab wounds. She
suffered three stab wounds to her chest and two stab wounds to the left side of her neck. She
had a blunt trauma injury to the top of her head and a bruise behind her right ear that was
consistent with a blow to the back of her head. She had abrasions on her torso, face, and
neck that were consistent with a violent struggle. The petechiae present in her eyes was
indicative of strangulation. She also had vaginal redness that was consistent with some sort
of penetration. 

 Miller checked the license plate number obtained by Shiner and found that it matched
a green Pontiac Sunfire that was registered to Freeney. Miller also ascertained that Freeney
lived at the Ravencrest apartment complex at 10003 Forum West, which was located almost
directly behind the Travel Lodge Motel. Miller put together a photo spread containing
Freeney's picture. Shiner and Sims identified Freeney in the photo spread. Shiner identified
Freeney at trial, but Sims was unable to do so. 

 A Harris County deputy constable discovered Freeney's abandoned car in the parking
lot of the Tinseltown Movie Theatre on Beltway 8 on April 19. Miller testified that he
observed a stain around the gear shift lever that looked like blood. DNA was extracted from
a swabbing of the gear shift. Forensic DNA analyst Jennifer McCue testified that the sample
contained a mixture of DNA from more than two individuals, and Freeney and Jones could
not be excluded from the mixture.

 On April 22, Officer Guy Majors was dispatched to the Ravencrest apartment complex
at about 1:30 a.m. When he arrived, he saw a naked woman covered in blood lying in the
grass next to the building. The woman told Majors that her name was Vicky Dean. She said
she had been attacked, but was unable to give Majors any information about her attacker. 
Majors observed that the window of a nearby apartment was open about five inches, and that
there was blood on the window and windowsill. When Majors pulled back the curtain and
looked inside, he saw blood all over the room.

 Majors and some other officers knocked on the door to the apartment. Lou Jackson,
Freeney's elderly aunt with whom he shared the apartment, answered the door. She gave the
officers permission to come inside and look through the apartment. She appeared very frail
and said that she had been undergoing treatment for cancer. She also gave Majors the phone
number of Freeney's girlfriend.

 Officer Glen Riddle testified that there was blood in the entryway and living room. 
A knife blade on the living room floor had bloodstains and two small strands of hair on it. 
There was a trail of blood leading to the bedroom and blood on the outside of the bedroom
door. Inside the bedroom, there was blood on the bed, walls, ceiling, and floor. The
bedroom was in disarray and the sheets and mattress cover had been pulled off the bed. A
black purse containing Dean's driver's license was lying on the bed. There were various
items scattered on the floor at the foot of the bed, including two women's sandals, a black
bra, a black dress, a box of condoms, a set of keys, and a small cosmetic bag. A black knife
handle without a blade was also lying on the floor near the bed.

 Carol Dempsey, Dean's sister, testified at trial that Dean had been living with her in
her condominium, which was located next door to the Ravencrest apartment complex. On
the evening of April 21, Dean was getting ready to go out for the evening and told Dempsey
that she had a date. Dempsey testified that Dean left at 10:05 p.m. and was wearing a dress
and sandals.

 Dean was transported to the hospital and died several days later. The medical
examiner testified that Dean had twenty "sharp force injuries" to her arms, hands, torso,
neck, and face. The fatal wound was the stab wound to her left eyebrow which entered her
eye socket, perforated the roof of her skull, and entered the left side of her brain. As a result,
a blood clot formed in her left internal carotid artery.

 Miller met with Freeney's girlfriend, Quentessa Synegal, who gave him information
as to the possible whereabouts of Freeney. Shortly before midnight on April 25, Miller and
Synegal drove to Bissonnet, where she identified Freeney sitting with a woman on a bus stop
bench in front of a Burger King. A team of police officers then arrested Freeney. The
woman he was sitting with identified herself as Shaekia Calhoun. Calhoun told Detective
John Swaim that she was a prostitute and that she and Freeney were discussing a price to go
to a nearby hotel room.

 Miller observed cuts and scratches on Freeney's hands and forearms when he
interviewed him at the police station. Freeney gave three audiotaped statements in which he
confessed to the murders of Jones and Dean. With regard to the Jones murder, Freeney said
that he picked up Jones on Bissonnet and they went to her room on the third floor at the
Travel Lodge. Freeney did not have any money and never intended to pay Jones for sex. 
Jones asked him for the money upfront when they went inside the motel room, and Freeney
"jumped on her." During the struggle, Jones reached for the phone and knocked it off the
hook. Freeney placed her in a "choke hold," and she passed out for about fifteen minutes,
during which time he attempted to have vaginal intercourse with her but could not ejaculate. 
When she "came to," he stabbed her in the side, chest, and neck with his pocketknife. Jones
then began performing oral sex on him, but again he did not ejaculate. As she was
performing oral sex on him, she had a "bleak look in her eyes," and slowly passed out and
died at the foot of the bed closest to the door. Afterwards, he used water to clean up the
areas that he touched. He picked up Jones's body and placed it in the bathtub; then he ran
some water in the tub and shut the shower curtain and the bathroom door. A man had been
knocking on the door for five to ten minutes while Freeney was cleaning up the room. When
Freeney opened the door and exited the room, the man asked if the girl was okay, and
Freeney said yes, and that she was in the bathroom. The man followed Freeney downstairs,
and Freeney got into his car and left. Freeney drove home, took a shower, and went to bed. 
The next day he left his car in the Tinseltown parking lot after he hit a median while driving
on Beltway 8.

 With regard to the Dean murder, Freeney stated that he met Dean on Forum West
street and that she willingly walked with him to his apartment. They entered the apartment
through his bedroom window. She told him she wanted the money right away, but Freeney
knew that he did not have any money. She asked him for something to drink, so he gave her
juice with a "sleeping aid" in it. Freeney also got a sharp knife with a black handle and a
"flimsy blade" from the kitchen and returned to the bedroom. Dean drank the juice, smoked
cigarettes, and talked to Freeney. He then told her to lie on the bed so he could give her a
massage. When she did so, he stabbed her in the neck. They wrestled, and he continued to
stab her and told her "she was stupid for being a prostitute." (5) After "the first few stabs," she
took her clothes off, and they attempted to have vaginal intercourse. She then performed oral
sex on Freeney, and he ejaculated. They fought again, and the knife broke at some point. 
Freeney swung the knife one last time and stabbed her in the left eye, and she told him, "Pull
this knife out of me so I can die." He threw the bedcovers over her and exited through the
window.

 DNA evidence also linked Freeney to the murders of Jones and Dean. Officer Riddle
testified that he recovered a pocketknife from "another location in Southwest Houston." (6) 
Riddle obtained swabs from the knife, which appeared to have bloodstains on it. McCue
testified that Jones's DNA profile matched the profile on the swabs. McCue also performed
DNA analysis on the two hairs found on the knife that was recovered from Freeney's
apartment. The DNA profile of the hair root matched Dean's DNA profile. In addition,
McCue detected Dean's DNA on some of Freeney's clothing. 

SUFFICIENCY OF THE EVIDENCE

 In his first point of error, Freeney argues that the evidence is legally insufficient to
support his conviction for capital murder. In evaluating the legal sufficiency of the evidence,
we must view the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. (7) Those who commit murders pursuant to the same scheme or course of
conduct have an "over-arching objective or motive" or engage in "a regular mode or pattern
of . . . behavior." (8) 

 Freeney contends that the evidence is insufficient to show that the murders occurred
during the same scheme or course of conduct. Freeney supports this argument by
highlighting some differences in the circumstances surrounding each murder. He asserts that
"[t]he State committed itself to a theory that the 'common scheme or course of conduct' was
the systematic murder of prostitutes . . . [y]et, the evidence failed to prove that Vicki Dean
was a prostitute." He points out that he attempted to conceal his identity after he murdered
Jones, but he did not do so with regard to Dean. Finally, he alleges that he used drugs to
sedate Dean but not Jones. 

 Despite Freeney's argument, there were enough similarities in Freeney's motive or
pattern of behavior that a rational juror could have found that the murders occurred during
the same scheme or course of conduct. Freeney picked up Jones, who was working as a
prostitute on Bissonnet, and went to her motel room intending to have sex with her without
paying her any money. He subdued her and caused her to lose consciousness by placing her
in a "choke hold," attempted to have vaginal intercourse with her, stabbed her in the chest
and neck when she regained consciousness, and then forced her to perform oral sex on him. 
Four days later, he picked up Dean on Forum West, which was located almost directly behind
the motel where he killed Jones. He brought Dean back to his apartment, believing that she
was a prostitute and intending to have sex with her without paying her any money. He
attempted to subdue Dean by giving her a "sleeping aid," stabbed her in the neck, torso, face,
and upper extremities, attempted to have vaginal intercourse with her, and had her perform
oral sex on him. Freeney was arrested three days later on Bissonnet, the same street where
he had picked up Jones. At the time of his arrest, he was sitting on a bench with a woman
who said she was a prostitute and they were discussing a price to go to a nearby motel room. 

 Based on the evidence at trial, a rational jury could have concluded beyond a
reasonable doubt that Freeney committed the murders of Jones and Dean during different
criminal transactions but pursuant to the same scheme or course of conduct. (9) Point of error
one is overruled. 

 In his second point of error, Freeney contends that the evidence is factually
insufficient for the same reasons expressed in his first point of error. In a factual sufficiency
review, we view all of the evidence in a neutral light, and we will set the verdict aside only
if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the
contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not
have been met. (10) A clearly wrong and unjust verdict occurs where the jury's finding is
"manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." (11) 

 In the instant case, the same facts that make the evidence legally sufficient also make
it factually sufficient. The evidence supporting the verdict was not so weak as to be clearly
wrong and manifestly unjust, nor was the contrary evidence so strong that the standard of
proof beyond a reasonable doubt could not have been met. (12) Point of error two is overruled. 

BATSON ERROR

 In points of error five, six, and seven, Freeney contends that the trial court erred in
overruling his Batson (13) objections to the State's peremptory challenges of prospective jurors
Doris Anderson, Borita Williams, and Annita Waller. A defendant objecting under Batson
must make a prima facie showing of racial discrimination in the State's exercise of its
strikes. (14) The burden then shifts to the State to articulate race-neutral explanations for its
strikes. (15) Once the prosecutor has articulated race-neutral explanations, the burden shifts
back to the defendant to show that the explanations are really a pretext for discrimination. (16) 
The trial court must then determine whether the defendant has carried his burden of proving
discrimination. (17) The trial court's determination is accorded great deference and will not be
overturned on appeal unless it is clearly erroneous. (18) 

 Freeney objected to the State's peremptory challenge against Anderson as follows:

 [DEFENSE COUNSEL]: The discussion we just finished with Juror
61, Doris Anderson, we would like to make an objection under Batson, Article
35.261 of the Texas Code of Criminal Procedure, in that we will again state for
the record that our client is a member of the minority race, African-American,
and Ms. Anderson was as well.


 We also feel like she clearly stated on the record that although she had
reservations about some of the areas of law that were inquired upon, she did
state firmly and clearly on the record that she could follow the law, and we
think the State improperly used a peremptory on her, in that we have other
potential jurors who are Caucasian who have also stated they could follow the
law and those other white jurors the State did not chose [sic] to use a
peremptory, and we think we have made a prima facie case and we would ask
the Court to inquire of the State to state on the record what race neutral
reasons, if any, they may have for having struck Mrs. Anderson.


 [THE COURT]: That will be denied. I heard the testimony.


 Although the trial court did not expressly rule on Freeney's prima facie case, Freeney
neither objected on this basis at trial nor complains about the absence of a ruling on appeal. (19) 
He instead complains that "the trial court erred by rejecting [his] Batson challenges." In the
context of a Batson claim, the defendant has the ultimate burden to demonstrate purposeful
discrimination by a preponderance of the evidence. (20) Freeney failed to meet this burden. He
generally alleged disparate treatment of black and white veniremembers, asserting that the
State failed to exercise peremptory challenges against "other potential jurors who are
Caucasian who have also stated they could follow the law." However, he failed to identify
these other jurors or point out the similarities between their testimony and Anderson's
testimony. And after reviewing the voir dire examination of Anderson in the light most
favorable to the trial court's ruling, we cannot conclude that the trial court's denial of the
Batson challenge was clearly erroneous. Point of error five is overruled. 

 Freeney objected to the State's peremptory challenge against Williams under Batson, 
arguing that the State "used a peremptory challenge for a juror who was otherwise qualified
under the law, stating clearly on the record she could follow the law and could return the
death penalty if it was based upon facts," and that there were "other similar Anglo potential
jurors who have equally qualified who they have not challenged peremptorily." The State
responded as follows:

 [PROSECUTOR]: Judge, I don't think they have made a prima facie
showing of any racial reasons. I will point out that we did select a young
African-American female just the other day, and in this case the questioning
was quite thorough as to her epiphany and change of opinion here. I think it
was quite obvious that she's a very, very weak juror and that she will have
some severe problems assessing a death penalty in any case no matter what her
statements to you are.


 So for that, plus she had some additional statements in here, which in
her questionnaire which are not favorable to the State. One of the people that
she admires is a strong anti-death penalty opponent. She also - - well, I will
just leave it at that. There are several answers in here which were not
favorable to this case. So I think the record is very clear that she would not
have been a favorable juror. There are other reasons why we made our strike,
so I don't believe they have made a prima facie showing.


 THE COURT: Well, go ahead and put your reasons for your strike on
the record, please.


 [PROSECUTOR]: Okay. I will just refer to what I just said, plus her
questioning was quite obvious. I don't think she was being truthful with us
when she said she could do it based on her questions and answers.


 The trial court's denial of Freeney's Batson challenge is supported by the record and
is not clearly erroneous. Williams indicated in her questionnaire that she did not believe in
the death penalty and that she thought it was unfairly assessed in many cases. She also
testified during voir dire that she believed that the prison system should be geared more
towards rehabilitation than punishment and that the death penalty was "[n]ot too much" of
a deterrent to other people. The trial court did not abuse its discretion in concluding that
these were race-neutral reasons for the strike. Point of error six is overruled.

 We next turn to Freeney's Batson challenge to the State's strike against Waller, who
stated during voir dire examination that she had once been shot in a dance club and that the
shooter had never been caught. Freeney objected to the State's peremptory challenge against
Waller under Batson, arguing that Waller was "clearly qualified under the law," and that the
State did not exercise strikes against "similar prospective jurors" who answered questions
in a "similar fashion." The prosecutor responded that Freeney had not demonstrated a prima
facie case, and the trial court asked the prosecutor to recite the reasons for the strike for
purposes of the record. 

 The prosecutor explained that Waller was struck because she expressed that
rehabilitation was more important than punishment for the person who had shot her, she
believed that a friend of hers had been rehabilitated after twenty-five years in prison, she
stated that she and her parents had been employed at agencies that provided rehabilitation
services, she thought life in prison was a stiffer punishment than the death penalty, she felt
like the death penalty was "the easy way out," she believed the death penalty was used too
often, and she reacted favorably to the possibility of probation in a murder case. The
prosecutor was also concerned that Waller had indicated on her jury questionnaire that she
would be a leader in "all situations." The prosecutor stated, "We want to make sure
everybody has got equal input, because it should be a decision by 12 individual people and
I don't think it would be appropriate for one person to be taking command and making all
of the decisions." The trial court found that the prosecutor's explanations were race-neutral
and overruled Freeney's objection.

 The prosecutor gave numerous reasons for striking Waller, none of which reflected
an inherently discriminatory intent. (21) The trial court's finding that the State's explanations
were race-neutral is supported by the record and is not clearly erroneous. Point of error
seven is overruled. 

HEARSAY EVIDENCE

 In his third point of error, Freeney alleges that the trial court erroneously permitted
Detective John Swaim to testify that Shaekia Calhoun told him at the time of Freeney's arrest
"[t]hat she was a prostitute and that [she] and Freeney were talking about a price to go to a
motel room nearby." Freeney objected to Swaim's testimony on hearsay grounds. The State
argued that the testimony was admissible under the present sense impression and statement
against interest exceptions to the hearsay rule. (22) The trial court overruled Freeney's objection
and admitted the testimony. Although it did not specify the exception under which the
testimony was admitted, the trial court's decision will be sustained if it is correct on any
theory of law applicable to the case. (23) 

 A determination regarding the admissibility of a statement against interest in
accordance with Rule 803(24) requires a two-step inquiry. (24) The trial court must first
determine whether the statement in question tends to expose the declarant to criminal
liability. (25) The trial court then determines whether there are corroborating circumstances that
clearly indicate the trustworthiness of the statement. (26) Any number of factors may be
considered in the inquiry, including: whether the guilt of the declarant is inconsistent with
the guilt of the accused; whether the declarant was so situated that he might have committed
the crime; the timing of the declaration and its spontaneity; the relationship between the
declarant and the party to whom the declaration was made; and the existence of independent,
corroborative facts. (27) Evidence undermining the reliability of the statement as well as
evidence corroborating its trustworthiness may be considered. (28) The standard for review of
a trial court's decision to admit or exclude a hearsay statement under Rule 803(24) is whether
the trial court abused its discretion. (29) 

 Calhoun's statements that she was a prostitute and that she was making arrangements
to commit an act of prostitution were sufficiently self-inculpatory because they exposed her
to criminal liability. There were also corroborating circumstances that clearly indicated the
trustworthiness of her statements. Officer Todd Miller testified that he learned about
Calhoun's "profession" by "checking her criminal history." Officer Guy Majors testified that
he saw Calhoun the night before Freeney's arrest and told her "[t]o get off the corner." 
Evidence that Freeney had recently solicited another prostitute in the same area also
corroborated Calhoun's statements. The trial court did not abuse its discretion in admitting
Swaim's testimony regarding Calhoun's statements. Point of error three is overruled. 

IDENTIFICATION PROCEDURE

 In point of error four, Freeney argues that the trial court should have suppressed Jason
Shiner's in-court identification of Freeney because it was tainted by a suggestive out-of-court
identification procedure. Shiner twice identified Freeney prior to trial. First, he identified
Freeney in a photospread the morning after Jones's murder. Second, he identified Freeney
in a live line-up approximately two weeks later. Freeney specifically complains that the line-up was impermissibly suggestive.

 A pre-trial identification procedure may be so suggestive and conducive to mistaken
identification that subsequent use of that identification at trial would deny the accused due
process of law. (30) A two-step analysis is used to determine the admissibility of an in-court
identification: (1) whether the out-of-court identification procedure was impermissibly
suggestive; and, (2) whether that suggestive procedure gave rise to a very substantial
likelihood of irreparable misidentification. (31) The analysis requires an examination of the
totality of the circumstances surrounding the particular case and a determination of the
reliability of the identification. (32) 

 Shiner and Miller each testified regarding this issue outside the presence of the jury. 
Shiner was in jail on a probation revocation at the time of the line-up on May 1, 2002. He
testified that, before he viewed the line-up, other inmates at the jail told him that the suspect
"had some scratches on his wrists." He did not tell police that he had heard this information
prior to the line-up. He testified that he was able to identify Freeney based on his facial
features and upper body. He testified that he was able to identify Freeney on that basis as
soon as he entered the room, before he even saw the scratches. Miller testified that Shiner
identified Freeney as he entered the room. Miller believed that Shiner identified Freeney
based on his facial features. He did not think that Shiner would have been able to clearly see
the scratches "in the few seconds that the defendant was visible before Jason made the
identification." 

 The trial court overruled Freeney's objection to Shiner's in-court identification of
Freeney. The trial court, however, excluded any evidence about Shiner's out-of-court
identification of Freeney in the line-up, because the State acknowledged that the line-up was
"potentially tainted," and the judge concluded that "everybody has agreed [it] is tainted." 
Assuming the line-up procedure was impermissibly suggestive based on these facts, we must
next determine whether the procedure gave rise to a very substantial likelihood of irreparable
misidentification.

 We consider several non-exclusive factors when determining whether there was a very
substantial likelihood of irreparable misidentification. (33) These factors are: (1) the witness's
opportunity to view the criminal act; (2) the witness's degree of attention; (3) the accuracy
of the suspect's description; (4) the level of certainty at the time of confrontation; and, (5)
the time between the crime and confrontation. (34) These factors are weighed against the
corrupting effect of any suggestive identification procedures. (35) 

 Shiner testified that when he saw Freeney exit the motel room, he "had a glance at the
person, but it was probably the best glance that [he] ever took." He testified that the area was
lighted, that he and Freeney were less than two feet apart when he saw his face, and that he
had additional time to view Freeney's physique when he followed him down the stairs. He
testified that the man he saw was bald-headed, 5'11" in height, had a dark complexion, and
was wearing a blue T-shirt and sweating. Shiner testified that he not only viewed Freeney
when he exited the motel room, but also had a short verbal exchange with him and wrote
down his license plate number as he drove away. 

 Shiner identified Freeney in a photospread shortly after Jones's murder. Miller
testified that Shiner made a "tentative identification" of Freeney in the photospread, meaning
that he was "fairly sure" but "not positive." Shiner testified that he was "certain" Freeney
was the man he saw exiting the motel room when he viewed him in the line-up about two
weeks later, and that he was able to identify him before he saw the scratches on his wrists. 
Finally, Shiner testified that he was able to identify Freeney at trial based on his view of
Freeney when he exited the motel room, and not because he remembered him from the line-up.

 Given this evidence, we conclude that the line-up procedure was not so suggestive as
to present a very substantial likelihood of irreparable misidentification. Shiner viewed
Freeney in a lighted area from a few feet away, paid a good amount of attention during his
interaction with Freeney, was "fairly certain" when he identified Freeney in the photospread
shortly thereafter, and was even more certain when he identified Freeney in the line-up about
two weeks later. Shiner testified that he identified Freeney in the line-up before seeing the
scratches, and that his in-court identification of Freeney was based on seeing him at the time
of the offense. The trial court did not abuse its discretion in permitting the in-court
identification. Point of error four is overruled. 

ADMISSION OF PHOTOGRAPHS

 In point of error eight, Freeney argues that the trial court violated Rule 403 when it
admitted gruesome photographs at the guilt or innocence phase of the trial. (36) He specifically
complains about State's Exhibits 43, 44, and 45, three photographs of Jones's body as it was
found in the motel bathroom.

 Rule 403 requires that a photograph have some probative value and that its probative
value not be substantially outweighed by its inflammatory nature. (37) A court may consider
many factors in determining whether the probative value of photographs is substantially
outweighed by the danger of unfair prejudice. These factors include: the number of exhibits
offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the
availability of other means of proof, and other circumstances unique to the individual case. (38) 
The admissibility of photographs over an objection is within the sound discretion of the trial
judge. (39) 

 The photographs were admitted during the testimony of Officer Christopher Phillips,
who observed Jones's body lying in the bathtub when he arrived at the crime scene. Phillips
testified that the photographs were representative of her body as he found it. The 8" x 10"
color photographs depict Jones's partially clothed body lying face-up in the bathtub. State's
Exhibit 43 shows Jones's body from the neck down. It is neither close-up nor detailed. 
State's Exhibit 44 offers a closer view of Jones's entire body. State's Exhibit 45 depicts
Jones's head, shoulders, and upper chest, and also shows a pair of underwear and an empty
bottle of Dial soap floating in the water. Some blood is visible in the photographs, but none
of the photographs offer detailed views of Jones's injuries. The photographs depict no more
than the gruesomeness of the crime scene as found by the police. (40) 

 Freeney also argues that the photographs were "duplicative" of State's Exhibit 46, the
scene videotape. A videotape, however, offers a panoramic view of the scene that still
photographs often do not offer. (41) The videotape aided the jury's understanding of the entire
crime scene, while the photographs focused on the location and condition of Jones's body
as it was found by police. (42) 

 The danger of unfair prejudice did not substantially outweigh the probative value of
the photographs. The trial court did not abuse its discretion in admitting State's Exhibits 43,
44, and 45. Point of error eight is overruled.

EXECUTION OF THE MENTALLY ILL

 In point of error nine, Freeney argues that "[t]he application of the death penalty to
Freeney was unconstitutional under Atkins v. Virginia because he is mentally ill." The
Supreme Court in Atkins held that it is unconstitutional to execute the mentally retarded. (43) 
Freeney urges us to extend this holding to the mentally ill, but cites no authority and presents
no argument persuading us to do so. (44) Point of error nine is overruled.

TEXAS DEATH PENALTY SCHEME

 Freeney's remaining points of error are multiple challenges to the Texas death-penalty
scheme. In point of error ten, he alleges that the statutory Penry (45) special issue is
unconstitutional because it fails to place the burden of proof on the State regarding
aggravating evidence. In point of error eleven, he asserts that the statutory Penry special
issue is unconstitutional because it permits the very type of open-ended discretion
condemned by the United States Supreme Court in Furman v. Georgia, 408 U.S. 238 (1972). 
In point of error twelve, he contends that the Texas death-penalty scheme is unconstitutional
because it does not permit meaningful appellate review of the sufficiency of the evidence
supporting the Penry special issue. In point of error thirteen, he claims that the Texas capital
sentencing statute's definition of "mitigating evidence" is unconstitutional because it limits
the Eighth Amendment concept of "mitigation" to factors that render a capital defendant less
morally "blameworthy" for the commission of the capital murder. In point of error fourteen,
he argues that the death penalty as presently administered in Texas is cruel and unusual
punishment in violation of the United States and Texas Constitutions. In point of error
fifteen, he alleges that the "10-12" rule violates the Eighth Amendment. In point of error
sixteen, he asserts that the Texas death-penalty statute is unconstitutional because it fails to
inform the jury that a single holdout juror on any special issue would result in an automatic
life sentence. We have previously rejected all of these arguments, and we decline to
reconsider our existing precedents in the instant case. (46) Points of error ten through sixteen
are overruled.

 We affirm the judgment of the trial court.


DATE DELIVERED: April 27, 2005


DO NOT PUBLISH

1. Tex. Penal Code § 19.03(a).
2. Unless otherwise indicated, all references to Articles refer to the Texas Code of
Criminal Procedure.
3. Article 37.071, § 2(g). 
4. Article 37.071, § 2(h). 
5. Miller testified that Dean had no criminal history of being a prostitute.
6. The location was revealed at the punishment phase to be the apartment of Kimberly
Bolden. The State introduced evidence at the punishment phase that Freeney stabbed and
attempted to rape Bolden in her apartment on April 21, 2002. 
7. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
8. Corwin v. State, 870 S.W.2d 23, 28-29 (Tex. Crim. App. 1993), cert. denied, 513
U.S. 826 (1994).
9. See Feldman v. State, 71 S.W.3d 738, 753 (Tex. Crim. App. 2002) (holding that a
rational jury could conclude that the murders occurred pursuant to the same scheme or course
of conduct when defendant killed two truck drivers and later attacked a third person whom
he thought was a truck driver).
10. Zuniga v. State, 144 S.W.3d 477, 486 (Tex. Crim. App. 2004). 
11. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). 
12. Zuniga, 144 S.W.3d at 486.
13. Batson v. Kentucky, 476 U.S. 79 (1986). 
14. Herron v. State, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002); Mathis v. State, 67
S.W.3d 918, 924 (Tex. Crim. App. 2002). 
15. Id. 
16. Id. 
17. Id. 
18. Id.
19. Tex. R. App. P. 33.1. 
20. Purkett v. Elem, 514 U.S. 765, 767-68 (1995). 
21. See Purkett, 514 U.S. at 768 (holding that "[u]nless a discriminatory intent is
inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."). 
22. Tex. R. Evid. 803(1), 803(24). 
23. Jones v. State, 982 S.W.2d 386, 389 (Tex. Crim. App. 1998), cert. denied, 528 U.S.
985 (1999); State v. Ross, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000). 
24. Bingham v. State, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999).
25. Id. 
26. Id. 
27. Id. at 58; Cofield v. State, 891 S.W.2d 952, 955 (Tex. Crim. App. 1994). 
28. Id.
29. Bingham, 987 S.W.2d at 57. 
30. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). 
31. Simmons v. United States, 390 U.S. 377, 384 (1968); Barley v. State, 906 S.W.2d
27, 33 (Tex. Crim. App. 1995), cert. denied, 516 U.S. 1176 (1996). 
32. Id.
33. Neil v. Biggers, 409 U.S. 188, 199-200 (1972); Barley, 906 S.W.2d at 34-35. 
34. Manson v. Brathwaite, 432 U.S. 98, 116 (1977).
35. Id. 
36. Tex. R. Evid. 403.
37. Id.; Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991), cert. denied, 505
U.S. 1224 (1992). 
38. Long, 823 S.W.2d at 272; Santellan, 939 S.W.2d at 172.
39. Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). 
40. Narvaiz v. State, 840 S.W.2d 415, 430 (Tex. Crim. App. 1992), cert. denied, 507
U.S. 975 (1993).
41. Ripkowski v. State, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001), cert. denied, 539
U.S. 916 (2003).
42. Matamoros v. State, 901 S.W.2d 470, 476 (Tex. Crim. App. 1995). 
43. Atkins v. Virginia, 536 U.S. 304, 321 (2002).
44. Tex. R. App. P. 38.1.
45. Article 37.071, § 2(e). 
46. Williams v. State, 937 S.W.2d 479, 491 (Tex. Crim. App. 1996); Pondexter v. State,
942 S.W.2d 577, 586-87 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 825 (1997); Green
v. State, 934 S.W.2d 92, 107 (Tex. Crim. App. 1996), cert. denied, 520 U.S. 1200 (1997);
Cantu v. State, 939 S.W.2d 627, 648-649 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 994
(1997); Ladd v. State, 3 S.W.3d 547, 575 (Tex. Crim. App. 1999), cert. denied, 529 U.S.
1070 (2000); Prystash v. State, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1102 (2000).